GOOD BROTHERS, INC., a Delaware corporation, Plaintiff-Appellee,

v.

Benjamin BANOWITZ, Defendant-Appellant.

No. 12583.

United States Court of Appeals
Seventh Circuit.

July 2, 1959.

Rehearing Denied Aug. 26, 1959.

Owen Rall, Chicago, Ill., Herbert C. Loth, Jr., John W. Kearns, Jr., Chicago, Ill., Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., of counsel, for appellant.

Albert E. Jenner, Jr., Chicago, Ill., Samuel W. Block, Sheldon Karon, Chicago, Ill., Thompson, Raymond, Mayer, Jenner & Bloomstein, Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and HASTINGS and CASTLE, Circuit Judges.

DUFFY, Chief Judge.

This a suit seeking a rescission of a written stock purchase agreement dated October 26, 1954. Plaintiff alleges defendant made false representations which were relied upon by plaintiff. As the result of the agreement, defendant sold to plaintiff 450 shares of common stock of B. & B. Enterprises, Inc. (B & B) for the sum of $218,750, and B & B sold to plaintiff 20 shares of its preferred stock for the sum of $200,000.

Plaintiff, Good Brothers, Inc., is a Delaware corporation which has been engaged in the distribution of foods to retail grocery stores since 1929, operating principally in the eastern states. Headquarters were in Montgomery County, Pennsylvania. At various times during the trial, headquarters were referred to as being in Philadelphia.

B. & B. Enterprises, Inc. processed and sold T V Time Popcorn. This corporation was chartered in Illinois on February 3, 1951, with an authorized capital stock of 250 shares of $100 par value each. On November 20, 1953, the authorized shares were increased to 2,000 having a par value of $100 each. On September 14, 1954, the Articles were amended to provide for 100 shares of preferred stock of $10,000 each. This preferred stock was callable on thirty days' notice, and was to receive a 5% cumulative dividend per annum and to have other priorities. On October 22, 1954, the number of directors was increased from four to five. On May 28, 1955, the corporate name was changed to T V Time Foods, Inc., and the authorized common stock became 200,000 shares at $1 per share instead of 2000 shares (of which 1000 had been issued) of $100 each.

In the summer of 1953, defendant Banowitz called on plaintiff in Philadelphia seeking to have plaintiff distribute T V Time Popcorn. At this time, Banowitz owned 450 shares of the common stock of B & B which was 50% of the then issued stock. Following that meeting there were some negotiations looking to a loan by plaintiff to defendant Banowitz and to B & B in exchange for an agreement granting plaintiff exclusive distributorship rights for T V Time Popcorn in its trade area.

In early April, 1954, a meeting was held in Philadelphia at the offices of Leon Meltzer, who was general counsel for plaintiff. Three agreements were prepared and executed, all dated April 8, 1954. The first agreement provided that plaintiff would lend $125,000 to Banowitz and $50,000 to B & B. The interest rate was 5%. Banowitz was required to deposit as collateral security 450 shares of common stock of B & B endorsed in blank. However, he retained the right to vote such stock. The second contract gave plaintiff exclusive distributorship of T V Time Popcorn in its trade area. In the third agreement, Banowitz gave plaintiff an option to purchase 300 shares of the common stock of B & B for $125,000, said option to be exercised before November 15, 1954. It was understood that the $125,000 loan to Banowitz would be used in the purchase of 450 shares of common stock of B & B held by another stockholder of the corporation.

Upon the same day or shortly after the execution of the three agreements, defendant's attorney sent a letter to plaintiff. It was undated, but stated: "You

have this day entered into an agreement with the undersigned * * *." It was signed "B. & B. Enterprises, Inc. by Benj. Banowitz, Pres." The letter informed plaintiff there were 1000 shares of authorized stock instead of 900 as stated in the agreements, and that there existed an oral agreement between B & B and an old employee to purchase 100 shares of the common stock presently authorized, but unissued, for $5,000. At the bottom of the letter appears: "Approved: Good Bros., Inc. by Tom Good. Attest: C. Heller."

In early October, 1954, Banowitz spoke to Mr. Heller, an officer of plaintiff, who was at that time in Chicago, and suggested that plaintiff purchase 100 or 150 shares of B & B in addition to the 300 shares under option. He also mentioned the oral option to Odd Carlsen, an old employee of B & B, to purchase 100 shares of common stock of B & B for $5,000 cash and $5,000 to be credited to Carlsen's unpaid back salary.

Odd Carlsen became an employee of B & B in 1952, but first became associated with defendant Banowitz in 1950. In the fall of 1951 Carlsen received a verbal option from Banowitz to purchase 100 shares of B & B common stock for $5,000 plus a credit for some earlier services. Prior to the October 26, 1954 meeting, Carlsen agreed to sell to Banowitz 50 shares of the optioned stock of B & B. A short time later, the agreement was changed to 51 shares. None of the agreements with Carlsen was in writing. Carlsen testified that on October 26, 1954, he had a verbal promise of an option for 100 shares. The corporate records of B & B were brought up to date before October 26, 1954, and were taken to Philadelphia at the request of plaintiff's attorney who examined same. These included Carlsen's letter to B & B of October 22, 1954, stating he was prepared to pay $5,000 for the stock and requesting that the shares be issued to him.

On October 23, 1954, the directors of B & B resolved to issue 100 shares of stock to Odd Carlsen upon receipt from him of $5,000. He actually paid that sum on November 3 or November 4, having borrowed the money from defendant.

On November 2, 1954, Carlsen received from Mr. Schwartz, the attorney for defendant, a stock certificate for 100 shares of B & B stock which Carlsen assigned over to the Voting Trustee under the voting trust hereinafter described. On November 19, 1954, the Voting Trustee issued trust certificate No. 3 to Odd Carlsen for 100 shares. Carlsen assigned 51 shares to Banowitz and 49 shares to himself. The assigned voting trust certificate was presented to the Voting Trustee for transfer on December 3, 1954, by Carlsen in person, and the Trustee issued and delivered to him voting trust certificates 4 and 5, being 51 shares to Benj. Banowitz and 49 shares to Odd Carlsen. The option of defendant Banowitz to purchase Carlsen's remaining 49 shares was dated November 2, 1954.

On October 9, 1954, Charles Heller, the secretary and treasurer of plaintiff, made a report in writing to Tom Good and Samuel R. Good, the other officers of plaintiff, and to plaintiff's attorney, Meltzer, and included in the report the following: "Carlsen Deal: This deal is for 100 shares at $100 or $10,000. Carlsen is to pay $5,000 in cash and get credit for $5,000 for back salaries earned but not paid. Ben [Banowitz] is to retain voting rights." At the trial, Heller testified: "Ben also stated he was going to retain the voting rights of that 100 shares."

In mid-October, 1954, a meeting was held in New York at the Waldorf-Astoria Hotel attended by defendant Banowitz and his attorney, Tom Good and Sam Good, officers of plaintiff, and their company's attorney. Banowitz pressed for a decision by plaintiff as to the option to purchase common stock. The option to Carlsen also was discussed, and Banowitz insisted he must honor that option. He stated: "One thing I definitely cannot do is to let you have under any kind of an arrangement an amount equal to 50% of the company's outstanding common

stock. There is an option I have given to an employee, Mr. Odd Carlsen, that I am determined to honor. It is for 100 shares of stock and he has worked hard for it. * * *" Banowitz offered to sell to plaintiff 450 shares of B & B, an amount equal to that held by him.

A meeting was held at Philadelphia on October 25 and 26, 1954. The plaintiff was represented by Tom Good and Samuel R. Good, its President and Vice President, and its attorney, Leon Meltzer, at whose office the meeting occurred. At this meeting, defendant Banowitz and his attorney discussed with the others present the option to Carlsen for 100 shares. The parties agreed that plaintiff would purchase 450 shares of common stock of B & B. They also agreed to execute a voting trust. It was further agreed plaintiff would purchase 20 shares of the preferred stock of B & B at the par value of $10,000 per share.

The stock purchase agreement was dated October 26, 1954, and was drafted by plaintiff's attorney after nearly three days' discussion by the parties. It recited Banowitz owned all 900 shares of common stock of B & B, that plaintiff wished to buy 450 shares for $218,750, and that Banowitz was willing to sell that number of shares provided plaintiff purchased from B & B 20 shares of preferred stock at $200,000. Banowitz agreed to repay a loan of $125,000.00 made to him in April, 1954. B & B agreed to repay a loan of $25,000 made to it on September 2, 1954. The stock purchase agreement provided for the simultaneous execution of a 10-year voting trust agreement. It was stated that the voting trust agreement was to be created "for a period of ten (10) years for the purpose of perpetuating the control and management of the Corporation in Banowitz and/or Good."

A voting trust agreement was executed and dated October 26, 1954. The parties were Ben Banowitz, depositor of 150 shares; Odd Carlsen, depositor of 100 shares; and Good Brothers, Inc., depositor of 150 shares of the common stock of B & B. The other party to the agreement was the Harris Trust and Savings Bank as Voting Trustee. The agreement provided it was to continue in force for ten years or until Banowitz died or became totally incapacitated and such incapacity existed for six months, or if Banowitz should own less than 250 shares of the common stock of B & B. The agreement provided the Trustee should vote the stock so that a majority of the Board of Directors would be those persons selected by Banowitz. It also provided if Banowitz died, became totally disabled or reduced his common stock holdings to less than 250 shares, the Trustee should vote the stock for plaintiff's nominees to the Board of Directors.

It was stipulated that when all the agreements hereinbefore described were executed, each party was represented by counsel and that the parties negotiated at arm's length.

In the fall of 1956, B & B, which by then had changed its name to T V Time Foods, Inc., was in financial straits. As early as August, 1956, meetings were held in Chicago with representatives of the principal creditors. Later, a creditors' committee was formed, and an agreement known as the MSUC[1] agreement dated December 13, 1956, was signed by plaintiff, defendant and Carlsen. Odd Carlsen succeeded Banowitz as president of the company. T V Time Foods, Inc. has since operated at a profit. The MSUC agreement recited that plaintiff was the "owner" of common stock of B & B and the "owner" of all the issued preferred stock. It pledged the stock to the Creditors' Advisory Board's Secretary. Under this agreement payments on the preferred stock were altered.

The first notice of rescission of the stock purchase agreement was given on May 14, 1957. The notice stated Banowitz had assured Good Brothers, Inc. that the ownership of T V Time Foods, Inc. would be divided 45% to Banowitz, 45% to Good Brothers, Inc. and 10% to

1. MSUC meaning "Major Secured and Unsecured Creditors."

Odd Carlsen, but that Banowitz was concurrently arranging with Carlsen to acquire 51% of the 10% stock interest which he [Carlsen] was to hold.

In the complaint, defendant was accused of falsely representing to plaintiff that by the purchase of 450 shares of common stock from defendant, plaintiff would thereby acquire equal corporate control of B & B, and that it was defendant's intent that he and plaintiff have equal share holdings in B & B.

Pursuant to court order, plaintiff filed a more definite statement under F.R.Civ. P. 12(e), 28 U.S.C.A. Plaintiff therein stated that defendant had falsely represented to plaintiff's officials that defendant could not sell more than 450 shares of common stock of B & B because he [defendant] was obligated to sell 100 shares of stock unissued but authorized. Plaintiff's statement also said that defendant falsely represented to plaintiff's officials that the common stock of T V Time Foods, Inc. was to be held 45% by plaintiff, 45% by defendant and 10% by a trusted employee to whom an option had been given.

On October 29, 1958, the District Court filed Findings of Fact and Conclusions of Law consisting of six short paragraphs. We are unable to ascertain which paragraphs are intended to be the Findings of Fact and which the Conclusions of Law. While the Findings state that plaintiff entered into the stock purchase agreement and voting trust agreement relying upon material false representations of defendant, there is no statement as to what these false representations were. Paragraph 2 stated plaintiff relied upon material false representations in the stock purchase agreement and the voting trust agreement; paragraph 3 states that plaintiff relied upon similar material false representations made orally. On December 15, 1958, the Court filed supplemental Findings of Fact and Conclusions of Law which related to the date of the written notice demanding rescission, and that defendant had refused such demand.

The original decree was entered October 29, 1958. It rescinded the purchase of 450 shares of common stock and required defendant Banowitz to pay plaintiff $418,750, to cover not only the purchase price of the 450 shares of common stock which he sold, but also the $200,000 which plaintiff paid to B & B for 20 shares of its preferred stock. This decree was vacated on the Court's own motion, and an amended decree was entered November 17, 1958. The original Findings and Conclusions were permitted to stand. The Court stated the first decree was too harsh, and also commented that at the time of the sale, the stock was worth what plaintiff paid for it.

Although the amended decree reduced the amount of recovery from $418,750 to $218,750 plus $10,000 "exemplary damages", defendant claims it is harsher in its operation on him than was the original decree. The amended decree grants plaintiff a right to vote all of defendant's stock as well as the stock already held by plaintiff until plaintiff has been paid $228,750, and T V Time Foods, Inc. has redeemed for $200,000 plus cumulative dividends of 5% per annum the 20 shares of stock which plaintiff purchased from B & B. Although defendant is not made liable to repay the $200,000 for the preferred stock, he is required to personally pay the 5% interest on this $200,000 "until such time as the said preferred stock is redeemed in full * * *." It is apparent defendant would have no way to compel the corporation to redeem the preferred stock as plaintiff is given the right by the decree to vote all of defendant's stock.

With respect to the MSUC agreement, defendant is ordered to execute an assignment to the escrowee appointed by the Court of his interest in his own stock now deposited under MSUC, and that whenever the obligations of T V Time Foods, Inc., under the MSUC agreement are discharged, the stock deposited with the Advisory Board's Secretary shall be delivered, not to the plaintiff, but to the escrowee. The decree also provides that

during the effective period of the MSUC agreement, defendant must take appropriate action "to nominate and cause to be elected, as his selections for such directors, persons selected by plaintiff."

The amended decree also provides that if defendant fails to satisfy the judgment, the defendant's own stock deposited with the escrowee shall be sold at public auction, and the proceeds applied on the judgment; and further, that defendant be enjoined from enforcing the provisions of an option agreement dated November 2, 1954, which was given by Odd Carlsen and who is not a party to this suit. Defendant was ordered to assign the Odd Carlsen option to the corporation. The Court stated that it was granting exemplary damages to cover reasonable costs and attorney fees of the plaintiff in the sum of $10,000.

■ We could not approve the form of the amended decree in any event. However, in view of our disposition of this case, we shall not discuss the terms and conditions of the decree further than to say the allowance of $10,000 attorney fees under the guise of "exemplary damages" is entirely unwarranted.

In spite of the varying descriptions of the alleged fraud warranting a rescission, it is apparent the District Court must have believed the alleged false statements had to do with the ultimate control of the corporation after the expiration of the trust agreement which might continue under its terms for a ten-year period.

On October 9, 1954, weeks before the stock purchase agreement and the voting trust agreement were executed, plaintiff's officials all knew that 100 shares to be owned by Carlsen were to be voted by defendant. Heller, the secretary-treasurer of the plaintiff, reported to the other officers of plaintiff as well as to its attorney: "Ben (Banowitz) is to retain voting rights." At the trial, Heller testified that Ben was going to retain the voting rights of the Carlsen 100 shares.

■ At no place in the stock purchase agreement or in the voting trust agreement is there any restriction with reference to the purchase of shares or voting trust certificates from Odd Carlsen by any person, nor is there any limitation on Odd Carlsen selling his shares. Furthermore, plaintiff had no right to assume that Carlsen would vote his shares as plaintiff might desire.

The gist of plaintiff's different versions of defendant's alleged fraud is that defendant's antecedent oral contract with Odd Carlsen to purchase 51 of Carlsen's 100 optioned shares, to be effective when the option was exercised, permitted defendant to gain control of the corporation and relegated plaintiff to a minority position.

During various stages of the negotiations, plaintiff's attorney Meltzer objected that his client was obtaining only a minority interest. He first objected on that ground when the option was prepared for plaintiff to purchase 300 shares. Later, when the stock purchase agreement and the voting trust agreement were in the course of preparation, Meltzer insisted that certain safeguards be included therein because "my people are buying a minority interest, a perpetual minority interest * * *."

From as early as October 9, 1954, plaintiff's officers knew that defendant was to have voting control over Carlsen's 100 shares of optioned stock. They also knew that if defendant lived ten years and was not totally disabled, and retained at least 250 shares of stock, he would control for ten years the stock deposited under the voting trust agreement. It is clearly evident that plaintiff purchased the stock knowing it would have a minority interest. There is no justification in this record for plaintiff's allegations in its complaint (¶ 10) that as a result of defendant obtaining 51 shares of stock from an employee "Plaintiff now holds a minority interest in a corporation controlled by the Defendant contrary to the clear understanding between the Plaintiff and Defendant that corporate control would be shared equally and that equal corporate interests was a fundamental

condition precedent to Plaintiff's entry into the said agreement."

Defendant never denied his agreement with Carlsen. Plaintiff argues, however, it was fraud not to have disclosed it. We do not understand how plaintiff was injured or damaged by Carlsen's owning 4.9% of the outside stock instead of 10%. Plaintiff was not harmed by defendant's acquisition of 51 shares of Odd Carlsen's stock, whether secret or public. The failure to disclose the existence of the antecedent agreement to buy those 51 shares was not, under the circumstances of this case, such a fraud as to justify rescission.

 Under Illinois law, in order to be actionable either at law or a ground for rescission in equity, fraud and injury must concur. Fraud without damage is not sufficient. Jones v. Foster, 175 Ill. 459, 51 N.E. 862; Struve v. Tatge, 285 Ill. 103, 120 N.E. 549.

There is an additional ground for holding that rescission may not be had in this case. The alleged fraud was committed on October 26, 1954. Plaintiff claims it first discovered same on September 12, 1956. On December 12, 1956, plaintiff signed the MSUC agreement representing that plaintiff was the owner of the stock here in question, and pledging the stock to the Creditors' Advisory Board's Secretary. The first notice of rescission was given May 14, 1957.

Plaintiff argues that it signed the agreement because otherwise the corporation might have been thrown into bankruptcy. Nevertheless, three months after plaintiff learned of the alleged fraud by defendant, it signed an agreement asserting it was the owner of 450 shares of stock. The choice which plaintiff had was, perhaps, difficult. Undoubtedly its motives in signing were praiseworthy. However, to assert in a formal document the ownership of the stock in question was inconsistent with its claim for rescission based on fraud. In effect, it was an election to affirm.

Defendant cites many Illinois cases and makes a strong argument that the delay in giving notice of rescission, and the bringing of suit for rescission more than a year after the alleged fraud was discovered, is sufficient reason for denying the remedy of rescission. However, we do not choose to rest our decision in this case on that ground.

Judgment is reversed with instructions to enter judgment for the defendant dismissing the complaint and the cause.

Reversed.